UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DENNIS MICHAEL SALERNO,

        Petitioner,        Case No. 1:05-cv-344

v.        Honorable Richard Alan Enslen

STATE OF MICHIGAN,

        Respondent.
_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is serving a term of life imprisonment without the possibility of parole, imposed by the Ingham County Circuit Court on August 22, 2002, after a jury convicted Petitioner of first-degree premeditated murder, MICH. COMP. LAWS § 750.316. In his *pro se* petition, Petitioner raises two grounds for relief, as follows:

    I.    Petitioner's first-degree murder conviction should be reversed where the prosecutor failed to produce sufficient evidence to establish beyond a reasonable doubt that the murder occurred in the State of Michigan.

    II.    Petitioner's Fourth Amendment rights were violated when police officers exceeded the scope of the search warrant and seized a computer-generated letter purposefully written by Petitioner's wife.

Respondent has filed an answer to the petition (docket #6) stating that the grounds should be denied. Upon review and applying the AEDPA standards, I find that Petitioner fails to raise a meritorious federal claim. Accordingly, I recommend that the petition be denied.

**Procedural History**

    A. **Trial Court Proceedings**

The state prosecution arose from the murder of Petitioner's estranged wife, Michelle Rizzi Salerno. It was the prosecutor's theory of the case that Petitioner murdered Michelle in her apartment in East Lansing on the evening of June 30, 2000. Michelle's body was found in April 2001 buried in a landfill by the campus of Bowling Green State University in Ohio. Petitioner waived his right to a jury trial and was tried in August 2002 on the charge of open murder.[1]

    Patricia Rizzi, Michelle's mother, testified that Michelle and Petitioner eloped on October 6, 1997. They first lived in Bowling Green, Ohio, where Michelle was a student. (Tr. I, 25, 53.) According to Rizzi, the couple had a tumultuous marriage. (Tr. I, 26.) In January 1998, Michelle was arrested for domestic violence after an altercation with Petitioner. (Tr. I, 72.) He later withdrew the complaint. (Tr. I, 77.) On August 5, 1998, Michelle called Rizzi and told her that Petitioner had shaken and choked her, and that she was afraid that he was going to kill her. (Tr. I, 27-28.) Rizzi and a friend went to Bowling Green and took Michelle to the Rizzi home in Swanton, Ohio. Rizzi observed bruises on Michelle's arms and a red mark on her neck. (Tr. I, 28.) That night, Petitioner came to Rizzi's home, beating on the front door and yelling. (Tr. I, 31-32.) Rizzi told Petitioner to leave and never to come back. (Tr. I, 32.) Michelle lived in her own apartment in Bowling Green for another year. (Tr. I, 72.) In the Summer of 1999, Michelle moved to East

---

[1] The trial transcripts will be referred to as follows:
8/19/2002 Volume I   (docket #20), "Tr. I"
8/20/2002 Volume II  (docket #21), "Tr. II"
8/22/2002 Volume III (docket #22), "Tr. III"
8/23/2002 Volume IV  (docket #23), "Tr. IV"
8/26/2002 Volume V   (docket #24), "Tr. V"
8/27/2002 Volume VI  (docket #25), "Tr. VI"

Lansing to attend graduate school at Michigan State University. (Tr. I, 32.) Petitioner moved in with her in October of 1999. (Tr. I, 32.) According to Rizzi, they had not lived together since August 5, 1998. (Tr. I, 33.)

In the Spring of 2000, Michelle told Rizzi that she wanted Petitioner to move out and that she planned to file for divorce. (Tr. I, 33-38.) Rizzi testified that in June of 2000, Michelle informed her that Petitioner had moved out, but was still coming back and forth to the apartment. Michelle had her locks changed, but believed that Petitioner still was getting into her apartment. (Tr. I, 40.) On June 11, Rizzi gave Michelle a burgundy Plymouth Reliant station wagon for transportation. (Tr. I, 39.) Rizzi last spoke to her daughter on June 28, 2000. (Tr. I, 41.) Michelle told Rizzi that the situation with Petitioner had deteriorated and that she was going to Legal Aid the following day for assistance with a personal protection order (PPO) and a divorce. (Tr. I, 42-43.) When Rizzi was unable to reach her daughter for several days, she contacted the East Lansing Police Department on July 5. (Tr. I, 43-45.)

At trial, Rizzi identified various items belonging to Michelle that were removed from an AARO storage unit. (Tr. I, 48-49.) She identified two sets of keys that belonged to Michelle. The sets were unique because one set had a rubber duck on it and the other set had a lady bug and frog. (Tr. I, 48.) Rizzi also testified that she recovered a roll of undeveloped film from the storage unit. (Tr. I, 48-49.) Rizzi developed the film, which included photos of Petitioner engaging in sex acts with another man. (Tr. I, 50; Tr. V, 488-89.)

Jessica Ostrowski, an East Lansing police officer, testified that she received a complaint from Michelle on June 26, 2000, that Petitioner had taken a video from her apartment. (Tr. I, 80.) Michelle told Ostrowski that she was afraid of Petitioner. (Tr. I, 82.)

Nicole Loghan, the manager of the Valley Forge Apartments where Michelle lived in East Lansing, testified that she and Michelle became friends in 2000. (Tr. II, 236.) Michelle expressed concerns to Loghan about Petitioner in the months preceding her disappearance. (Tr. II, 232.) On one occasion, Michelle told Loghan that she was planning to get a PPO against Petitioner because she was afraid. She also told Loghan that she had a scar on her head from where Petitioner had hit her with a cup. (Tr. II, 233.) Michelle also asked Loghan to change the locks on her apartment so Petitioner could not get in. (Tr. II, 234.) She also talked about moving to a different apartment so Petitioner could not find her. (Tr. II, 234.)

Robert Foren, the maintenance person at the Valley Forge Apartments, testified that he received an order on June 22, 2000, to change the locks on the front door of Michelle's apartment. (Tr. II, 244-45.) He installed the new locks on the afternoon of June 26. (Tr. II, 246.) According to Foren, the lock he installed contained five or six pins. (Tr. II, 246.) On the afternoon of June 28, Foren saw Petitioner at the apartment. Petitioner said that he was tightening up the lock. (Tr. II, 247.) Foren was surprised that the lock required tightening two days after it was installed. (Tr. II, 248.) When the lock was inspected on July 10, 2000, it had only two pins. (Tr. III, 322.) In order to remove the pins, the entire lock has to be disassembled and the cylinder removed. (Tr. III, 322.) After the pins are removed, the lock is easier to pick. (Tr. III, 322.)

Darci Licquia, a friend in Michelle's graduate program, testified that Michelle told her in June of 2000 that she was fearful of Petitioner. (Tr. I, 91, 94-95.) Licquia last saw Michelle on June 29, 2000. (Tr. I, 97.) Michelle told Licquia that she was going to get a PPO against Petitioner. (Tr. I, 97.) She and Michelle were supposed to meet at a going away party for friends the following night, but Michelle did not show up. (Tr. I, 98.) Licquia went to Michelle's apartment

at 8:30 or 9:00 p.m. and knocked on the door. (Tr. I, 102-104.) When no one answered, she left a note on the door. (Tr. I, 103.) Licquia noticed that Michelle's burgundy station wagon was not parked outside. (Tr. I, 101-02.) Another friend, Marcie Gilles, testified that in the spring of 2000, Michelle told her that she feared Petitioner would follow her and she never knew when he was going to be at her apartment. (Tr. I, 112-13.) Michelle also told Gilles that she was going to get a PPO against Petitioner. (Tr. I, 113.) Darcy Whitney, an employee at Community Mental Health where Michelle worked as an intern, testified that Michelle did not show up for work at her scheduled time on the afternoon of June 30. (Tr. I, 144-46.)

Diena Lampinen, an employee at the Ingham County personal protection order office, testified that Michelle called the office on June 23 and inquired about getting a PPO against Petitioner. (Tr. I, 89.) Amy King, a student intern at Legal Aid of Central Michigan in the summer of 2000 met with Michelle Salerno on June 29, 2000. (Tr. III, 306.) Michelle wanted to file for divorce and told King that she was afraid of her husband. (Tr. III, 307.) Michelle told King that her fear has escalated after she had her locks changed and her husband still got into her apartment in the middle of the night. Michelle woke up with Petitioner standing over her, screaming. (Tr. III, 308.) Michelle indicated that she had an appointment the following day to get a PPO. (Tr. III, 307.) Michelle left the Legal Aid office at about 6:15 p.m. on June 30. (Tr. III, 309.)

Michelle's next-door neighbor, Jason Cachia, a sales manager for the Lansing State Journal, hired her to deliver newspapers at the end of June. (Tr. I, 131.) On June 30, 2000, he went with her to show her the route. (Tr. I, 131-33.) Using her station wagon, they started at 3:30 a.m. and returned to the apartment complex at 6:00 a.m. (Tr. I, 133-34.) He left the route map in her car. (Tr. I, 135-36.) Cachia testified that Michelle typed a PPO letter on his computer. (Tr. I, 143.)

Jeffrey Thomas, an East Lansing Police Officer, testified that in response to Mrs. Rizzi's missing person report he was dispatched to Michelle's apartment on July 5 to make a "welfare check." (Tr. I, 151.) Thomas did not believe that anyone had been in Michelle's apartment recently because he found rotting food and twenty-three messages on her answering machine. (Tr. I, 156.) Thomas described the apartment as messy and could not tell whether an assault had taken place there. (Tr. I, 159-60.) He did not observe any blood. (Tr. I, 160.) Thomas received a description of Petitioner's car from Michelle's neighbors. (Tr. I, 154-55.) Petitioner drove a light blue mini-van with an Ohio license plate. (Tr. I, 154-55.)

East Lansing Police Officer Marc Smith testified that he was dispatched to the Brookfield Plaza after an off-duty officer observed the blue Dodge mini-van and male suspect the police were looking for in connection with Michelle Salerno's disappearance. (Tr. II, 188.) Officer Smith stopped Petitioner while he was driving the van. (Tr. II, 188.) Petitioner gave the officer a Michigan State identification card with the name Larry Emil Salerno. (Tr. II, 189.) Petitioner indicated to officers Smith and Gonzales that he was going to the Union to pick up his cousin, Dennis Salerno. (Tr. II, 190, 200.) The officers believed that the driver was Dennis Michael Salerno because he matched a photo they had in connection with Michelle's case. After further investigation, Petitioner was arrested at the scene for providing false identification to a police officer. (Tr. II, 192.) Petitioner also had outstanding bench warrants for driving on a suspended license. (Tr., 192.) Petitioner was searched incident to his arrest. (Tr. II, 193.) Petitioner possessed a blank check written to Michelle Salerno and a Harrah's Total gold card bearing Michelle Salerno's name. (Tr. II, 193-94.)

East Lansing Police officers conducted three searches of Petitioner's van. (Tr. II, 251-52, 263.) The officers observed a variety of papers strewn throughout the back of the van. (Tr. II,

- 6 -

269-70.) Among the documents seized by the officers was a Greyhound bus ticket receipt issued to Larry Salerno for a one-way ticket from Toledo, to Detroit, to East Lansing. (Tr. II, 272.) According to Grey Hound Bus Line records, Larry Salerno purchased the ticket for a bus that left Cincinnati at 6:30 p.m. on June 30, 2000, picked up passengers in Toledo and arrived in Detroit at 11:55 p.m. (Tr. III, 350.) He boarded another bus in Detroit the following morning at 7:30 a.m. and arrived in East Lansing at 9:25 a.m. (Tr. III, 350-51.) In the van, officers also found a birth certificate for Larry Salerno (Tr. II, 265-67); used rolls of packing and duct tape and three lock-picking kits (Tr. II, 273); a key that was labeled "AARO Storage Rental Facility" (Tr. II, 253); a key ring with a yellow rubber duck on it and a second set of keys (Tr. II, 254); and a pair of muddy brown shoes (Tr. II, 255-56).

Jerald Sweet, the owner of AARO rentals, testified that he rented a storage unit to Petitioner at a facility located in DeWitt, Michigan. (Tr. III, 324.) Petitioner was provided with one door key and one gate key. (Tr. III, 325.) Officer Richard Torres later searched the AARO storage unit. Torres found a large box of papers. (Tr. III, 257.) Inside the box, Torres found an unsigned copy of the PPO that Michelle prepared on June 29, 2000. (Tr. II, 257.)

East Lansing Police Detective Todd Quick testified that he searched Michelle's apartment after her disappearance. (Tr. V, 514.) There was no sign of forced entry or visible tampering with the lock. (Tr. V, 516-17.) He described the apartment as being in a state of disarray. Some of the cushions were missing from the couch. A cushion matching those from Michelle's couch was found in Petitioner's van. (Tr. V, 516.)

Officer David Vincent put the license plate number for Michelle's missing Reliant station wagon into the police LIEN system. (Tr. III, 297.) Within minutes, the officers received a

call from authorities in Toledo, Ohio. The car was impounded for failure to pay parking fees. (Tr. III, 297.) Franke Vibbard, a parking lot attendant in a private parking lot in downtown Toledo, testified that he first saw the burgundy station wagon parked in the lot on the morning of July 1, 2000. (Tr. III, 331.) He ticketed the car on July 3 because the parking had not been paid. (Tr. III, 332.) When the car was still parked in lot on July 6, Vibbard called the police to have the car towed. (Tr. III, 333.) The car was parked in the same spot over the entire period that it was in the lot. David Barnes, a special agent for the Ohio State Bureau of Criminal Identification and Investigation, searched the station wagon after it was impounded. (Tr. III, 299.) Barnes found four copies of the Lansing State Journal dated June 30, 2000 and a subscriber list. (Tr. III, 301.) Finger prints were lifted from the inside of the driver's window. (Tr. III, 303.)

Sergeant William Mitchell of the East Lansing Police Department testified that on the evening of Petitioner's arrest he received a call from Marcia Scarberry at the Ohio Bureau of Investigations. (Tr. II, 213.) Scarberry had seen television reports regarding Petitioner's arrest and had tied the name "Salerno" to a homicide that occurred at an Ohio truck stop. (Tr. II, 213.) Scarberry testified that Petitioner was charged in the murder of Larry Allan McClanahan. McClanahan's body was found in a shower stall at a Petro Truck Stop located off I-280 on July 3, 2000. He had severe lacerations on his hands, which were described as defensive wounds, and his throat was cut. (Tr. IV, 374.) McClanahan's vehicle was found at another truck stop across the highway. (Tr. IV, 375.) Scarberry testified that a Cobra LTD Citizen Band radio with a diesel cancellation mike was missing from Mr. McClanahan's vehicle. (Tr. IV, 375.) The same type of radio was found during the search of the van Petitioner was driving at the time of his arrest. (Tr. IV, 376.) According to Scarberry, McClanahan hired a private detective on May 22, 2000, to locate

Petitioner. (Tr. IV, 380.) The investigator obtained several possible addresses for Petitioner and provided them to McClanahan. (Tr. IV, 380.) Petitioner pleaded guilty to second-degree murder of McClanahan. (Tr. IV, 377.)

Pamela McClanahan, Larry McClanahan's widow, testified that Mr. McClanahan met Petitioner when they were incarcerated together at the Pickaway Correctional Facility. In 1992 or 1993, after both men were released, Petitioner contacted Mr. McClanahan. Mr. McClanahan tried to help Petitioner, who was in trouble for writing bad checks, and invited him to stay with the McClanahans. (Tr. IV, 413.) Petitioner stayed with them for three or four months. (Tr. IV, 413.) Mrs. McClanahan was not aware of Mr. McClanahan having contact with Petitioner near the time of his death and was not aware that Mr. McClanahan had hired a private detective to find Petitioner. (Tr. IV, 418.) Mr. and Mrs. McClanahan were separated at the time of his death. (Tr. IV, 411.) She last saw her husband on Sunday, July 2, 2000. (Tr. IV, 411-12.)

In April of 2001, Scott Morningstar, a heavy equipment operator at Bowling Green State University, was instructed to dig up a body at a landfill on University property. He used a scoop and found Michelle's body. (Tr. IV, 383-84.) She was buried about three feet under the ground. (Tr. IV, 384.) The burial site was about two hundred yards from the ground keeper's shop, which was staffed seven days a week from 6:30 a.m. to 4:00 p.m. (Tr. IV, 388-89.) Forensic pathologist Diane Scala-Barnett conducted the autopsy on Michelle's body. (Tr. III, 290.) Dr. Scala-Barnett concluded from injuries to Michelle's neck that she was strangled to death. (Tr. III, 290-95.) At the time of the autopsy, Michelle was wearing a pair of blue bikini panties and a blue T-shirt. (Tr. III, 295.) Dr. Scala-Barnett was unable to estimate a time of death because Michelle's body was in advanced state of post-mortem decomposition. (Tr. III, 295.) Thomas Vogel, an expert in

geochemistry, testified that soil samples from the shoes seized from Petitioner's van exactly matched the soil samples taken from the victim's body. (Tr. IV, 396.) However, neither the soil from the shoes nor the soil from the body matched the soils from the Bowling Green area where the victim's body was found. (Tr. IV, 396-97.) In other words, the shoe soil and the body soil matched, but they did not match the soil in the area where the victim's body was found. (Tr. IV, 404.)

   Gregory Michaud, an employee of the Michigan State Forensic Laboratory, testified as an expert in latent fingerprint examination. (Tr. V, 461.) Michaud testified that finger prints lifted from the "Statement for PPO" found in the AARO storage unit and matched prints from both Michelle and Petitioner. (Tr. V, 463-64.) Michaud found Petitioner's palm and finger prints on the Greyhound bus ticket that was found in the van. (Tr. V, 466.) Michaud also determined that the print lifted from the inside of the driver's window of Michelle's station wagon matched Petitioner's right index finger. (Tr. V, 467-68.)

   Thomas Huff testified that he and Petitioner were incarcerated at the same time at the Wood County Jail in Ohio. (Tr. IV, 421.) Petitioner told Huff that he was in jail for murdering his boyfriend and that he also was accused of murdering his wife. (Tr. IV, 426.) Petitioner told Huff that he murdered his wife because she found out that he had an affair with a man while he was at the Pickaway Prison and she was going to tell people about it. (Tr. IV, 426.) According to Huff, Petitioner stated that he killed his wife in Lansing, Michigan. (Tr. IV, 426-27.) Petitioner told Huff that after he killed her, he put her in the trunk of his car and drove around for several hours before dumping her in Lake Erie, off of I-75. (Tr. IV, 427.) Petitioner tied cement blocks around her ankles. (Tr. IV, 441.) Huff testified that Petitioner did not mention anything about moving her body or burying her someplace else. (Tr. IV, 427.) After Petitioner killed his wife, he met Larry, his

boyfriend, at a Petro Truck Stop just south of Toledo. Larry panicked when Petitioner told him that he killed his wife, so Petitioner killed Larry while he was taking a shower. (Tr. IV, 427.) Huff and Petitioner had two conversations about the murders. (Tr. IV, 428.) Petitioner gave the same account both times. (Tr. IV, 428.) As soon as Huff was moved from the Wood County Jail to the Correction Reception Center in Ohio, he sent a letter to the Wood County Prosecutors regarding Petitioner's statements to him about the murders. (Tr. IV, 428.) Huff was in jail for social security fraud, for which he has been sentenced to fourteen months. (Tr. IV, 422.) In exchange for his testimony at Petitioner's preliminary examination, Huff was released on parole. (Tr. IV. 422-23.) Huff's testimony at trial was not part of the agreement, but Huff wanted "to tell the truth." (Tr. IV, 423.)

Petitioner gave three taped interviews with East Lansing Detectives on July 10 and 12, 2000. Both tapes were played for the trial court. (Tr. III, 342.)[2] In the July 10 tape, Petitioner denied any knowledge of the disappearances of Larry McClanahan or his wife. During the second session of the taped interview on July 12, Defendant admitted to killing Larry McClanahan. Petitioner alleged that McClanahan told him that he (McClanahan) had killed Michelle and tried to force sex on Petitioner by using a knife. Petitioner alleged that he took the knife and stabbed McClanahan. Petitioner continued to deny any direct knowledge concerning the disappearance of his wife.

At the conclusion of trial, the court found overwhelming evidence that Petitioner murdered his wife in the first-degree. (Tr. VI, 598.) The trial court found credible Mr. Huff's

---

[2] The Court has adopted Petitioner's summary of his statements to police as set forth in his brief before the Michigan Court of Appeals (docket #27.) Petitioner's statements were not made a part of the trial record and this Court was not provided with separate transcripts of the interviews. Petitioner's statements to police are not at issue in this case and are not necessary to the resolution of his grounds for habeas corpus relief.

testimony that Petitioner admitted to killing Michelle and that he killed her in East Lansing. (Tr. VI, 588-89.) On October 2, 2002, the trial court sentenced Petitioner to life imprisonment without the possibility of parole. (Sentencing Transcript, ("S. Tr."), 26, docket #34.)

### B. Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on April 22, 2003, raised the same two issues as raised in this application for habeas corpus relief. (See Def.-Appellant's Br. on Appeal, docket #27.) By unpublished opinion issued on February 24, 2004, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (See 2/24/04 Mich. Ct. App. Opinion ("MCOA Op."), docket #27.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same two claims raised before and rejected by the Michigan Court of Appeals. Petitioner also raised a new claim concerning a discovery violation that is not included in his habeas petition. By order entered August 31, 2004, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (See Mich. Ord., docket #28.)

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 791 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir.

2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing

- 13 -

*Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### I. Sufficiency of the Evidence

Petitioner claims that the prosecution failed to present sufficient evidence to establish beyond a reasonable doubt that Michelle was murdered in the State of Michigan. A § 2254 challenge to the sufficiency of the evidence is governed by the standards set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of

fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* The habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The Michigan Court of Appeals found sufficient evidence of venue, stating:

> Venue, although not an element of a crime, is nonetheless a part of every criminal case, and must be proved by the prosecution beyond a reasonable doubt. *People v Fisher,* 220 Mich App 133, 145; 559 NW2d 318 (1996). Due process requires that a criminal prosecution take place before a trier of fact of the city or county where the offense occurred, except as otherwise provided by the Legislature. *People v Lee,* 334 Mich 217, 225-226; 54 NW2d 305 (1952).
>
> This Court reviews de novo whether the trial court had proper venue in a criminal case de novo. *Fisher*, *supra* at 145. Venue is a factual issue and the trier of fact was permitted to make rational inferences and consider circumstantial evidence in finding that the crime was perpetrated in Ingham County. See *People v Belanger*, 120 Mich App 752, 757; 327 NW2d 554 (1982).
>
> Viewing the evidence in the light most favorable to the prosecution, a rational fact finder could have found beyond a reasonable doubt that the victim was killed in Ingham County. Thomas Huff testified that he met defendant while in jail in Ohio in February 2001. Defendant told Huff he was in jail for murdering his boyfriend, and eventually told Huff that he had murdered his wife in Lansing because she found out that he had an affair with a man and was going to "tell everybody about it." Additionally, the testimony established that the victim feared defendant, had the locks on her apartment changed, and was in the process of seeking a personal protection order against him. The victim was last seen at her apartment in East Lansing at 6:00 a.m. on June 30, 2000, after finishing a newspaper delivery route. The victim was scheduled to begin her internship work at Community Mental Health at 9:00 a.m. on June 30, but did not show up for work, did not call in to report that she would be absent, and was not seen alive by anyone after 6:00 a.m. on June 30, 2000. The following morning, the victim's Plymouth Reliant was seen parked in a Toledo, Ohio, parking lot at 7:30 a.m. Defendant's fingerprint was found on the inside of the driver's door window. The timing of the victim's disappearance, as well as evidence that the victim was minimally clothed when her body was discovered and that she would not have voluntarily left her apartment with defendant, provides

>sufficient circumstantial evidence that the victim was killed inside her apartment on June 30. *Fisher, supra*, at 145-146; MCL 767.45(1)(c).

(MCOA Op. 1-2.)

The decision of the Michigan Court of Appeals is supported by the record. Thomas Huff testified that he and Petitioner were incarcerated at the same time at the Wood County Jail in Ohio. (Tr. IV, 421.) Petitioner told Huff that he murdered his boyfriend and wife. (Tr. IV, 426.) Huff testified that Petitioner provided further details regarding the murders, including the fact that Petitioner murdered his wife in Lansing, Michigan. (Tr. IV, 426-27.) The trial court found credible Mr. Huff's testimony that Petitioner admitted to killing Michelle in Lansing. (Tr. 588-89.) While Petitioner contends that Huff's testimony was not credible, issues of credibility may not be reviewed by the habeas court. *See Herrera v. Collins*, 506 U.S. 390, 401-402 (1993). The trial court and the Michigan Court of Appeals cited additional circumstantial evidence that further supports a finding that the murder took place in East Lansing. Therefore, I cannot find that the decision of the Michigan Court of Appeals is an unreasonable application of clearly established Supreme Court precedent.

II.   Illegal Search

Petitioner also claims that his Fourth Amendment rights were violated when police officers exceeded the scope of the search warrant for the AARO storage unit and seized the computer-generated application for a personal protection order purportedly written by Michelle. Both Petitioner and Michelle's finger prints were found on the letter. The Michigan Court of Appeals affirmed the trial court's finding that the letter fell within the plain-view exception to the warrant requirement.

Defendant also argues that the trial court erred by denying defendant's motion to suppress a letter written by the victim that was seized by police officers during a lawful search of a box found in a storage unit because the letter did not constitute evidence or contraband. The trial court found that the letter fell under the plain-view exception to the warrant requirement:

> It has been stipulated that the officers were lawfully in the storage – that the officers were lawfully present, pursuant to a warrant, in the storage locker. They were authorized pursuant to that warrant to search for papers and writings of the defendant. In so doing, they uncovered what has been marked as Exhibit 1 to the prosecutor's brief.
>
> It is a one-page typed written statement. It is dated the day before the victim of this crime disappeared. It is a request for a personal protection order. It is signed by the victim. The first line of that statement states that the victim seeks protection from the defendant.
>
> Whether one views the investigation at that time as a missing person's investigation or a murder investigation, it is and would be, to any reasonable investigator, immediately apparent that such a document would have relevancy to the investigation. This is not a case where the police have further invaded the privacy of the defendant. They did not go into an area not authorized. They did not inspect types of documents that were not authorized.
>
> Their conduct, under the totality of the circumstances, was reasonable, and the statement was lawfully seized under the plain view doctrine. Motion is denied.

Findings of fact regarding a motion to suppress evidence are reviewed for clear error, and the trial court's ultimate decision on a motion to suppress is reviewed de novo. *People v Attebury*, 463 Mich 662, 668; 624 NW2d 912 (2001); *People v Fosnaugh*, 248 Mich App 444, 450; 639 NW2d 587 (2001).

The plain-view exception to the warrant requirement allows seizure of objects falling within the plain view of an officer who has a right to be in the position to have that view. *Harris v United States,* 390 US 234, 236; 88 S Ct 992, 993; 19 L Ed 2d 1067 (1968); *People v Tisi,* 384 Mich 214, 218; 180 NW2d 801 (1970); *People v Wilson*, 257 Mich App 337, 361; 668 NW2d 371 (2003). Two conditions must be satisfied. First, there must be prior justification for the officer's intrusion into an otherwise protected area. *Coolidge v New Hampshire,* 403 US 443, 466; 91 S Ct

> 2022, 2038; 29 L Ed 2d 564 (1971). This condition is not in dispute. Second, the evidence must be obviously incriminatory or contraband. *Wilson, supra*. We find no clear error in the trial court's factual findings regarding this condition. Upon de novo review, we conclude that the letter was properly seized under the plain view exception to the warrant requirement. [FN 1. Further, testimony was presented that the victim was seeking a personal protection order against defendant, and therefore, the letter was duplicative evidence.]

(MCOA Op. 2-3.)

Petitioner's Fourth Amendment claim is barred from habeas corpus review under the doctrine of *Stone v. Powell*, 428 U.S. 465 (1976). In *Stone v. Powell*, the Supreme Court held that federal habeas review is not available to a state prisoner alleging that his conviction rests on evidence obtained through an unconstitutional search or seizure, as long as the state has given the petitioner a full and fair opportunity to litigate the Fourth Amendment claim. *See also Machacek v. Hofbauer*, 213 F.3d 947, 952 (6th Cir. 2000); *McQueen v. Scroggy*, 99 F.3d 1302, 1332 (6th Cir. 1996).

In order for the rule of *Stone v. Powell* to apply, the state must have provided, in the abstract, a mechanism by which to raise the Fourth Amendment claim, and the presentation of the claim in the present case must not have been frustrated by failure of that mechanism. *See Gilbert v. Parke*, 763 F.2d 821, 823 (6th Cir. 1985). If these two inquiries are satisfied, federal habeas review of the Fourth Amendment claim is precluded, even if the federal court deems the state-court determination of the claim to have been in error. *Id.* at 824; *accord Jennings v. Rees*, 800 F.2d 72 (6th Cir. 1986).

In the present case, it is clear beyond doubt that petitioner cannot satisfy either prong of the Sixth Circuit standard. First, it is undisputed that Michigan has a state procedural mechanism which, in the abstract, presents a full opportunity to raise a Fourth Amendment claim before trial. Even before the United States Supreme Court decided that the federal exclusionary rule applied to

state criminal proceedings, the Michigan courts applied the exclusionary rule to the fruits of unconstitutional searches and seizures. *See People v. Margelis*, 186 N.W. 488 (Mich. 1922). After *Mapp v. Ohio*, 367 U.S. 643 (1961), the Michigan courts have consistently acknowledged their duty, under both the federal and state constitutions, to suppress evidence seized in violation of the Fourth Amendment. *See*, *e.g.*, *People v. David*, 326 N.W.2d 485, 488 (Mich. App. 1982). Consequently, Michigan affords criminal defendants a vehicle by which to raise Fourth Amendment challenges.

Second, Petitioner has not alleged any grounds to support the conclusion that presentation of his Fourth Amendment claim was somehow frustrated due to a failure of the state's mechanism. The trial court held an evidentiary hearing on Petitioner's motion to suppress evidence and found that the evidence was properly seized under the plain view exception. The Michigan Court of Appeals reviewed Petitioner's Fourth Amendment claim and affirmed the trial court's ruling. He applied for leave to appeal to the Michigan Supreme Court, which denied his application. Therefore, even if this Court were to somehow disagree, which it does not, with the determination of the Michigan courts, that disagreement would be insufficient to satisfy the second prong of the Sixth Circuit standard. The Sixth Circuit has pointedly held that the doctrine of *Stone v. Powell* applies, even if the federal court deems the state-court determination of the Fourth Amendment claim to have been in "egregious error." *Gilbert*, 763 F.2d at 824 (citing *Riley v. Gray*, 674 F.2d 522, 526 (6th Cir. 1982)).

To satisfy the second prong of *Stone v. Powell*, petitioner must allege facts showing that the state corrective mechanism has somehow broken down. *See*, *e.g.*, *Agee v. White*, 809 F.2d 1487, 1490 (11th Cir. 1987) (habeas review not barred when state appellate court completely ignored Fourth Amendment claim). Petitioner has not alleged any facts showing that the state's mechanism has broken down. Rather, it is clear that the Michigan courts gave Petitioner's Fourth Amendment

claim full and proper consideration. This is plainly sufficient to bar habeas review of Petitioner's claim under the doctrine of *Stone v. Powell*. In any event, as noted by the Court of Appeals, admission of the letter did not prejudice Petitioner because it was cumulative of testimony from numerous witnesses that Michelle intended to get a PPO against Petitioner. Moreover, while Petitioner's fingerprints were found on the letter, there was other overwhelming evidence that Petitioner murdered his wife.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Date: January 10, 2007                     /s/ Ellen S. Carmody
                                            ELLEN S. CARMODY
                                            United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).